# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### District Judge William J. Martínez

Civil Action No. 14-cv-01185-WJM

MARLON L. SMITH,

     Applicant,

v.

LOU ARCHULETA, Warden, and
JOHN SUTHERS, The Attorney General of the State of Colorado,

     Respondents.

---

## ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

This matter is before the Court on Applicant Marlon L. Smith's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Application"), ECF No. 1.[1] Respondents filed an Answer, ECF No. 37, on April 1, 2015.  Applicant filed a Traverse, ECF No. 47,  on July 17, 2015.  After reviewing the pertinent portions of the record in this case including the Application, the Answer, the Traverse, and the state court record, ECF No. 38, the Court concludes that the Application should be denied and the action dismissed.

## I.  BACKGROUND

Applicant is challenging the validity of his conviction and sentence in State of Colorado Criminal Case No. 02CR3477.  The evidence at trial indicated that Applicant barged into a home where his estranged wife was staying; where he shot and killed his wife and wounded two other occupants of the home.  *See People v. Smith*, No.

---

[1] Because Applicant appears *pro se*, the Court construes his filings liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21(1972).  However, the Court does not serve as his advocate.  *See Hall v. Bellman*, 935 F.2d 1106, 1110 (10th Cir. 1991).

03CA1273, 1 (Colo. App. Feb. 10, 2005) (direct appeal).  The procedural background of

Applicant's criminal case was summarized in the Colorado Court of Appeals' (CCA's)

opinion addressing his Colo. R. Crim. P. 35(c) postconviction motion as follows.

> In 2002, defendant was convicted of first degree murder after deliberation, two counts of first degree assault with serious bodily injury, first degree burglary, three counts of felony menacing, and violation of a restraining order.  On direct appeal, a division of this court affirmed the judgment of conviction.  *People v. Smith*, (Colo. App. No. 03CA1273, Feb. 10, 2005) (not published pursuant to C.A.R. 35(f) (*Smith I*).  The supreme court denied certiorari on June 21, 2005.

> Defendant subsequently filed a Crim. P. 35(c) motion for postconviction relief asserting sixty-one separate claims, which the trial court denied after a hearing.  This appeal followed.

> Defendant contends the trial court erred in denying his motion because the court's findings of fact and conclusions of law are either incomplete or are not supported by the record.  We discern no reversible error.

*People v. Smith*, No. 10CA0098 (Colo. App. July 5, 2012).  The Colorado Supreme

Court (CSC) denied Applicant's petition for certiorari review of the Rule 35 motion on

October 7, 2013.  *See Smith v. People*, No. 2012SC618 (Colo. Oct. 7, 2013).

## II.  FEDERAL COURT PROCEEDINGS

Applicant asserts twelve claims in the Application.  Claim Eleven has three

subparts.  The Court conducted a preliminary review of the twelve claims and dismissed

Claims Two and Four, and Claim Eleven, as it pertains to forensic evaluations.  ECF

No. 31 at 14.  The Court deferred ruling on the *Martinez v. Ryan,* --- U.S.---, 132 S. Ct.

1309 (2012) issue in Claim Twelve, until the Court had the opportunity to review the

state court record.  The remaining claims are as follows.

(1)     State district court violated due process rights by refusing to suppress an unduly suggestive photo-identification procedure;

(3)     State district court violated due process rights by failing to remedy the admission of unfounded, inflammatory hearsay evidence designed to frame the government's theory of the case;

(5)     State district court violated due process rights by denying him an opportunity to suppress collateral use by the government of prior unconstitutional convictions;

(6)     State district court violated due process rights by failing to conduct a *Weidemer* analysis regarding the validity of prior convictions, burdening his right to testify;

(7)     Evidence is insufficient to sustain a guilty verdict for burglary, felony murder, and violating a restraining order;

(8)     Sentence for the offense of attempted felony murder in Count Four should be vacated because there was only one killing;

(9)     Ineffective assistance of appellate counsel for failure to amend opening brief when U.S. Supreme Court issued decision in *Crawford*;

(10)     *Crawford* due process issue;

(11)     Ineffective assistance of trial counsel for failure to:

> i) Investigate and present evidence of wife's drug overdose;
>
> ii) Object to the prosecution eliciting expert opinion from domestic violence expert without tendering her as expert witness; and
>
> iii) Recognize a nonwaivable conflict of interest; and

(12)     Ineffective assistance of postconviction counsel for failure to present the result of a mental health examination during the postconviction process and trial counsel's failure to present these results to the courts or to petitioner implicating *Martinez*.

## III.  LEGAL STANDARDS

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be

issued with respect to any claim that was adjudicated on the merits in state court unless

the state court adjudication:

> (1)  resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States; or
>
> (2)  resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003).  The threshold question the Court must answer under § 2254(d)(1) is whether

Applicant seeks to apply a rule of law that was clearly established by the Supreme

Court at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362,

390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

decision."  *Id.* at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases
> where the facts are at least closely-related or similar to the case *sub
> judice*.  Although the legal rule at issue need not have had its genesis in
> the closely-related or similar factual context, the Supreme Court must
> have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008) (citation omitted).  If there is no

clearly established federal law, that is the end of the Court's inquiry pursuant to

§ 2254(d)(1).  *See id.* at 1018.

If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent."  *Maynard* [*v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405 [  ].  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' "  *Williams*, 529 U.S. at 405 [  ] (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts.  *Id.* at 407-08.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry.  *See Williams*, 529 U.S. at 409-10.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable."  *Id.* at 411.  "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law."  *Maynard*, 468 F.3d at 671.  Furthermore,

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in

> reaching outcomes in case-by-case determinations.  [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations and internal quotation marks omitted).  In conducting this analysis, the Court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.  In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254."  *Maynard*, 468 F.3d at 671; *see also Richter*, 562 U.S. at 102 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2).  *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of

the evidence presented to the state court.  Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Applicant bears the burden of rebutting the presumption by clear and convincing evidence.  "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court's analysis is not complete "[e]ven if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).  "Unless the error is a structural defect in the trial that defies harmless-error analysis, [the Court] must apply the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . ." *Id.*; *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (providing that a federal court must conduct harmless error analysis under *Brecht* anytime it finds constitutional error in a state court proceeding regardless of whether the state court found error or conducted harmless error review).

Under *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict.  *Brecht*, 507 U.S. at 637.  "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." *Bland*, 459 F.3d at 1009 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).  "Grave doubt" exists when "the matter is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435.  The Court makes this harmless error determination based upon a review of the entire state court record.  *See Herrera*

*v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000).  "In sum, a prisoner who seeks

federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his

claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA."

*Davis v. Ayala*, 576 U.S. ---, 135 S. Ct. 2187, 2199 (2015) (citing *Fry*, 551 U.S. at

119-120).

Furthermore, a claim may be adjudicated on the merits in state court even in the

absence of a statement of reasons by the state court for rejecting the claim.  *Richter*,

562 U.S. at 98.  In particular, "determining whether a state court's decision resulted

from an unreasonable legal or factual conclusion does not require that there be an

opinion from the state court explaining the state court's reasoning."  *Id.* (collecting

cases).  Thus, "[w]hen a federal claim has been presented to a state court and the state

court has denied relief, it may be presumed that the state court adjudicated the claim on

the merits in the absence of any indication or state-law procedural principles to the

contrary."  *Id.* at 99.  "Where there has been one reasoned state judgment rejecting a

federal claim," federal habeas courts should presume that "later unexplained orders

upholding that judgment or rejecting the same claim rest upon the same ground.  If an

earlier opinion fairly appear[s] to rest primarily upon federal law."  *Ylst v. Nunnemaker*,

501 U.S. 797, 803 (1991) (citation and internal quotation marks omitted) (supported in

*Hittson v. Chatman*, --- U.S. ---, 135 S. Ct. 2126, 2127 (June 15, 2015) (Ginsburg, J.,

concurring in denial of certiorari review).

Even "[w]here a state court's decision is unaccompanied by an explanation, the

habeas petitioner's burden still must be met by showing there was no reasonable basis

for the state court to deny relief."  *Richter*, 562 U.S. at 98.  In other words, the Court

"owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).  Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim de novo and the deferential standards of § 2254(d) do not apply.  *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## IV.  DISCUSSION

Prior to discussing the merits of each claim.  The Court will address the *Martinez* issue in Claim Twelve.

## A.    Claim Twelve/*Martinez*

In the Order for Answer, ECF No. 31, in this case, the Court stated as follows.

In *Martinez*, the Supreme Court held:

[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

9

*Id.* at 1320.  The petitioner must also show that the underlying ineffective assistance of counsel claim is "substantial"— i.e., has "some merit."  *Id.* at 1318.  The holding in *Martinez* recognizes an exception to *Coleman v. Thompson*, 501 U.S. 722, 753–55 (1991).  In *Coleman*, the Supreme Court's stated that being there is no constitutional right to counsel in a state collateral proceeding, an attorney's errors in the proceeding do not establish cause for a federal habeas petitioner's procedural default.  *See Martinez*, 132 S. Ct. at 1315.  *Martinez* applies only when "the State [bars] the defendant from raising the claims on direct appeal," so that postconviction proceedings are an applicant's first opportunity to present an ineffective assistance of trial counsel claim.  *Martinez* 132 S. Ct. at 1320; *see also Trevino v. Thaler*, --- U.S. ---, 133 S. Ct. 1911, 1915 (2013) (extending *Martinez* to circumstances in which state law does not require claims of ineffective assistance of trial counsel to be brought in collateral proceedings, but "make[s] it virtually impossible for an ineffective assistance claim to be presented on direct review" (quotation omitted)).

The Colorado Supreme Court "has expressed a preference for having ineffective assistance of counsel claims brought in Crim. P. 35(c) proceedings."  *People v. Thomas*, 867 P.2d 880, 886 (Colo. 1994) (internal citations omitted); *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003) ("In light of the considerations potentially involved in determining ineffective assistance, defendants have regularly been discouraged from attempting to litigate their counsels' effectiveness on direct appeal.")).  "Review of a claim of ineffective assistance of trial counsel that is raised on direct appeal is limited to the existing record."  *Downey v. People*, 25 P.3d 1200, 1202 n.3 (Colo. 2001) (citing *People v. Blehm*, 983 P.2d 779, 792-93 (Colo. 1999); *see also People v. Apodaca*, 998 P.2d 25, 29 (Colo. App.1999) (citing *Thomas*); *People v. Price*, 240 P.3d 557, 565 (Colo. App. 2010) ("Only 'in rare instances' are ineffective assistance of counsel claims presented so that they 'need no further [factual] development prior to review on direct appeal.' ") (quoting *People v. Kelling*, 151 P.3d 650, 655 (Colo. App. 2006)).

The Court is reluctant to determine at this time, without the benefit of the state court record of Applicant's criminal proceeding, whether the procedurally defaulted ineffective assistance issue raised in Claim Twelve is substantial.  The Court will defer ruling on whether Applicant has demonstrated cause for his procedural default under *Martinez v. Ryan* pending the Court's receipt of the state court record.

Mar. 3, 2015 Order for Answer, ECF No. 31 at 12-14.

Applicant asserts in the Application and in his Reply to the Pre-Answer

Response, that Claim Twelve is subject to a waiver of procedural default pursuant to

*Martinez* because the postconviction counsel failed to raise an ineffective assistance of trial counsel claim regarding trial counsel's failure to present to the trial court or to Applicant, either prior to or during the trial, the results of Applicant's mental health examination, which was performed at the request of Applicant's trial counsel.  ECF No. 1 at 32; ECF No. 16 at 9.

In the Pre-Answer Response, ECF No. 11, Respondents assert that Claim Twelve is procedurally defaulted because the claim was not raised in any state court and now any attempt to litigate this claim is procedurally barred under Colorado state law pursuant to Colo. R. Crim. P. 35(c)(VII), but they do not address whether the claim is substantial or has merit.  In the Answer, Respondents argue that this claim should be dismissed as unexhausted because Applicant failed to raise the claim in any state postconviction proceeding and Colorado law allows collateral review of allegations of ineffective assistance of postconviction counsel.  ECF No. 37 at 62.  In the alternative, Respondents argue this claim lacks merit because Applicant stated on the record that he did not suffer from mental health issues and the mental health examination Applicant relies on is not part of the state court record.  *Id.* at 63-64.

In his Traverse, Applicant asserts that he was not competent at trial.  ECF No. 47 at 29.  He further contends, even though his postconviction counsel found a psychological evaluation that was ordered by the trial court and showed Applicant was incompetent to stand trial, postconviction counsel refused to raise the mental health issue in the postconviction proceeding.  *Id.*  Applicant contends that his trial should have been delayed until he was competent and proceeding with the trial violated his due process rights.  *Id.*

Applicant's assertions in support of Claim Twelve are highly speculative. He bases his arguments on a psychological evaluation that he claims he is only "vaguely aware" of; and he further contends that the evaluation should be available because it was ordered by the court or obtained alternatively from either trial or postconviction counsel. ECF No, 47 at 29.

The Court has reviewed the State Court Record in Criminal Case No. 02CR3477. CD Court (Flat) File & File Folder Transcripts, ECF No. 38. In reviewing the transcript of a conflict hearing held on October 10, 2002, Applicant stated the following regarding his mental health at that time.

> TRANSPORT OFFICER: Mr. Smith has had some problems at the jail with his mental health. And he -- threatened suicide, so he was being held -- I don't know when the letter was written, but he may have been in that state of mind when he did it.
>
> THE COURT: Are you concerned about his competency?
>
> TRANSPORT OFFICER: Well, our mental health evaluator talked to him and -- put him back in the normal population now, so I believe he is okay.
>
> THE COURT: Okay. Officer, what is your last name?
>
> TRANSPORT OFFICER: Porcelli, P-o-r-c-e-l-l-i.
>
> (Pause. Proceedings concluded at the bench.)
>
> THE DEFENDANT: Your Honor, can I say something?
>
> THE COURT: Absolutely. That is why we were here.
>
> THE DEFENDANT: The deputy was saying something about me being under mental health care. I am not under mental health care for one. We had a misunderstanding last night about I filled out a paper to -- what is it -- to -- it was for the inmate's classification.

THE COURT:  Yes.

THE DEFENDANT:  For some reason they sent me a nurse instead of the inmate's certification people.  And the deputies asked me a question.  I misunderstood the question.  They asked me whether I was trying to hurt myself, and I told them yes, but I misunderstood what they were asking me, so that was the problem that happened last night, but we got that all straightened out.

THE COURT:  Sounds like it was a classification issue.  And maybe they did misunderstand your answer.

THE DEFENDANT:  Yes, we got it all straight this morning.

THE COURT:  So you don't feel you are having any mental health problems?

THE DEFENDANT:  No, I am not having any mental problems.  I have not had any mental health problems at all.  This was a misunderstanding.

THE COURT:  Do you understand what we are talking about here today?

THE DEFENDANT:  Yes, I do.

Case No. 02CR3477, Oct. 10, 2002 Conflict Hr'g Tr. at 4-6.

Applicant also testified at his Rule 35(c) hearing that he had reviewed his motion and trial transcripts, "and all that type stuff," twenty to thirty times and had been researching his case during the seven years he had been incarcerated after his trial. Case No. 02CR3477, Nov. 23, 2009 Rule 35(c) Hr'g at 10-11.  Applicant further testified that he had "motions -- everything that has to do with [his] case . . . [e]verything." Id. at 12.

Applicant originally stated in the Application and his Reply to the Pre-Answer that trial counsel ordered the evaluation, and neither he nor the court were aware of the

results, ECF No. 1 at 32; but in his Traverse he contends the trial court ordered the evaluation, ECF No. 47 at 29.

Based on Applicant's acclaimed thorough review of everything related to his criminal trial, he should be able to identify with some accuracy where in the state court record such a court directive for an evaluation would be found.  But, he has not done so.  Upon review of the Court File and all transcripts of the proceedings in Applicant's state criminal case, the Court finds nothing regarding mental health issues other than the October 10, 2002 conflict hearing, where Applicant stated clearly that he did not have any mental health problems.  There is no directive on the record by the trial court for a mental evaluation or any reason identified by the court or trial counsel during the pretrial or the trial that a mental evaluation was necessary.

Based on the above findings, Applicant's claim lacks merit and does not meet the substantial requirement set forth in *Martinez*.  Without such a finding, the Court need not determine whether the postconviction review proceeding was sufficient or review the merits of Claim Twelve.  *Martinez*, 132 S. Ct. at 1318.  Claim Twelve is procedurally defaulted and, therefore, barred from federal habeas review.

**B.      Claim One/Suggestive Photo-Identification Admitted**

In Claim One, Applicant asserts that the photo identification procedure used by the police was suggestive.  ECF No. 1 at 7.  Applicant further asserts that the trial court erred by refusing to suppress the identifications in violation of his due process rights.  *Id.*

Specifically, Applicant contends that Mr. Roberto Gutierrez and Ms. Esther Sanchez identified Applicant as the suspect within a few hours of the shooting, while

they were in the same room at the hospital and were only shown faces of a six-person photo array. *Id.* Applicant further contends that before Mr. Gutierrez viewed the array he described the suspect as a black male who had two braids and he acknowledged that during the shooting he heard Ms. Sanchez refer to the suspect as "Uncle Marlon." *Id.* Applicant concludes Mr. Gutierrez had a "preconception" of the suspect's age because Ms. Sanchez, who was seventeen, referred to Applicant as an uncle, making the suspect a generation older than she is; and as a result the photo array was reduced to only three possible individuals (a suggestive lineup as a matter of law) because the other three looked too young to be Ms. Sanchez's uncle. *Id.* at 8.

Applicant further contends that Ms. Sanchez selected the same photo of Applicant in the photo array, as Mr. Gutierrez, only moments after Mr. Gutierrez had made his selection. *Id.* at 7. Applicant also contends that Mr. Gutierrez and Ms. Sanchez discussed their selections in violation of the police officer's directive not to do so. *Id.*

Finally, with respect to Tabitha White, another person who identified Applicant in the photo array, Applicant contends that she was asked to view the same photo array as Mr. Gutierrez and Ms. Sanchez, even though she had not given a previous statement indicating any recollection of the suspect's physical appearance. *Id.* Applicant further contends that before Ms. White viewed the photo array and identified Applicant she was coached by family members and was then able to identify Applicant in the array. *Id.* at 8.

Regarding Applicant's suggestive photo array claim, the CCA found as follows.

## I. Suggestive Identification

While in the hospital, two victims were asked to identify their assailant from a photographic lineup. Both picked defendant. Defendant now argues that the identification procedure was unduly suggestive. We disagree.

In determining whether photo identification evidence was properly admitted, we employ a two-part analysis. The defendant first must show that the photo array was impermissibly suggestive. If the defendant meets this burden, the prosecution must show that the witness's identification was nevertheless reliable under the totality of the circumstances. *Bernal v. People*, 44 P.3d 184, 191 (Colo. 2002).

In evaluating whether a pretrial photo identification procedure is impermissibly suggestive, several factors are relevant, including the number of people depicted in the photo array, the manner of its presentation, and the details of the photographs themselves. *Bernal*, *supra*. These factors are related: the fewer the photographs used in a particular array, the closer the photographs must be scrutinized for suggestive irregularities. *Bernal*, *supra*.

Here, the witnesses were shown a photo array that included six pictures. At trial, defendant argued that the array was impermissibly suggestive because he was the "only person with long straight hair" and because only one other person had the same skin tone. The trial court rejected this argument, finding that the six photographs depicted individuals of similar appearance. The court also found that the photos contained similar backgrounds and presented no stark contrasts. Our review of the photo array confirms the trial court's findings.

Defendant now argues that the array is suggestive because of the age of the individuals depicted. He notes that the victims had heard a seventeen year old witness refer to the assailant as "Uncle Marlon." He notes that the term "uncle" suggests that the assailant was a generation older than that witness. And he argues that, because only three of the individuals appear old enough to be the

> witness's uncle, the lineup unduly suggested that he was the assailant.
>
> We are not persuaded by this argument.  To the extent that the photographs suggest different ages, defendant appears to be one of the younger men. Therefore, the lineup could not be unduly suggestive in the way that defendant contends.
>
> Because we affirm the trial court's determination that the lineup was not unduly suggestive, we need not inquire whether the identifications were nevertheless reliable under the totality of circumstances.

*People v. Smith*, 03CA1273, 2-4 (Colo. App. Feb. 10, 2005).  Applicant raised the same issues in his opening brief on direct appeal, *see* Pre-Answer Resp., Ex. B (Opening Brief), ECF No. 11-2 at 11-14, as he has stated in support of Claim One in this action. The CCA addressed only with any specificity the age issue and referred to only two witnesses who participated in a photo identification.  The CCA, however, affirmed overall the trial court's determination that the lineup was not unduly suggestive and found no need, therefore, to inquire whether the identifications were nevertheless reliable under the totality of the circumstances.

Pursuant to the pretrial court hearing, held on January 2 and 6, 2003, the trial court entered an order on January 9, 2003, that addressed the findings of the pretrial hearing as follows.

> THIS MATTER comes before the Court on a variety of Motions as noted herein:
>
> Defendant's Motion to Suppress Identification of Witnesses (Def. Mtns. #1,2,3):  Defendant contends that the in court identification of the Defendant by three witnesses (Roberto Gutierrez, Esther Sanchez and Tabatha White) should be suppressed due to unduly suggestive photo lineups. Specifically, Defendant contends that the photo array (which was the same photo array shown to all three witnesses) was

unduly suggestive in that there was only one other photo of a black male with a similar skin complexion and that Defendant's photo was the only one with long straight hair. Further, Defendant contends that a conversation between Robert Gutierrez and Esther Sanchez, after they individually viewed the photo lineup, tainted the selection since Esther Sanchez told Roberto Gutierrez which photo she had selected and confirmed with him that he selected the same one, which was the Defendant's photo.

*Bernal v. People*, 44 P.3d 184 (Colo. 2002) provides the most recent pronouncement on photo lineups.  As noted in *Bernal*, a two-part analysis is required.  First, it is the Defendant's burden to establish that the photo array was impermissibly suggestive.  Second, if Defendant meets that burden then it is the People's burden to show that, despite the improper suggestiveness, under the totality of the circumstances the identification was nevertheless reliable.

It is of interest to note the description of the events and the suspect as testified to by the witnesses.  Roberto Gutierrez testified that the lighting in the room was "bright" and that he had no difficulty seeing the people he was with on the evening of the shooting.  He stated that he had a good look at the man who entered the house and described him as a tall black male, with his hair braided in two braids, and wearing a white t-shirt and shorts.  He stated that the time of the shooting seemed to last forever.  He also described the gun used as a black revolver approximately 5-6" long.  He said he also heard Esther Sanchez yell "No Uncle Marlon" or words to that effect.  However, he had never met the Defendant.  After he was shot he ran from the house. Approximately 3-31/2 hours after the shooting he was shown the photo lineup by Detective Bjorkvist.  Prior to the viewing of the photo lineup the Detective read the cautionary statement and the witness stated no one told him anything about who the shooter was prior to seeing the photo array. He stated that the Detective did not try and help select or describe the suspect.  When he viewed the array, his girlfriend, Esther Sanchez, and her mother were in the room but were made to stand on the other side of the room away from his hospital bed.  According to the witness and the Detective he selected Defendant's photo "right away" with no apparent hesitation.  After he made his selection the Detective also showed the lineup, again in the same manner which was outside the immediate presence of Roberto

Gutierrez, to Esther Sanchez who also was given the same cautionary instruction and immediately selected Defendant's photo.

Esther Sanchez testified that she is the niece of the Defendant and had known him for approximately one year and had seen him on some occasions and when she stayed with her aunt, Mary Lou Smith.  On the evening of the shooting she was in the house and the same room as the other witnesses when the door opened and she immediately recognized the Defendant as the suspect.  She testified she yelled at him to stop and "don't do this."  She stated she saw Defendant shoot Mary Lou Smith, Roberto Gutierrez and Tabatha White.  She said the lighting in the house was good and the event seemed to last for ten minutes.  Later, at the hospital with Roberto Gutierrez, she was contacted by Detective Bjorkvist and, after waiting on the other side of the hospital room while the detective showed Mr. Gutierrez the photo lineup, was also shown the lineup.  Prior to seeing the lineup no one had suggested to her who to select.  When she saw the lineup she immediately recognized Defendant and selected his photo.

The third witness, Tabatha White, was also present during the shooting and was herself a shooting victim.  She testified that she was visiting the home on the evening of the shooting and that the lighting was good enough to read in. Previous to this incident she had never met the Defendant. On the evening of the shooting she stated the door opened and a 6 foot thin black male came in and started shooting. She ran into a bedroom and crouched down behind a dresser and pleaded with the suspect who had followed her into the room not to shoot her as she was pregnant.  She stated she had eye contact with the suspect when the suspect shot her and left the room.  On cross examination she stated she could not recall giving an officer at the hospital a clothing description of the suspect but did recall a small black gun.  She also apparently stated to the officer at the hospital that she didn't know if she could identify the suspect. She stated that the day after the shooting while she was still in the hospital some of the people who were in the house the night of the shooting came by and told her "they think it was him."  However, at no time did anyone describe the Defendant to her.  Two days after her release from the hospital she was contacted by Detective Del Wedge who showed her the same photo array as the other witnesses.

She too was given the cautionary instruction and, according to the Detective, selected Defendant's photo within 2-3 seconds of viewing it.  She testified, as did the Detective, that no one provided any suggestions as to who to select. She stated that on a scale of 1-10 she would give her selection a 9 as to certainty of the selection as the person who shot her.

Detective Graham testified he, with the assistance of a computer aided selection process, acquired the photo array used in the lineup with the witnesses.  He stated he looked for black males of the same age group, hair and complexion. He testified he used six photos, one of which was the most recent photo on file of the Defendant that showed him with long straight hair.  He did not use another photo of the Defendant which was approximately three years old and showed the defendant with braided hair. He also testified that prior to assimilating the array he did not know that the suspect's hair was described by one of the witnesses as braided.

Part of the record admitted at the motions hearing was a color copy of the photo array.  As previously noted, it is Defendant's burden to establish that the array was impermissibly suggestive.  Factors to consider include the number of photos in the array, the manner of presentation by the officers, and the details of the photographs themselves. *Bernal*, at 191.  While a greater number of photos in an array means it is less likely that a minor difference will have a prejudicial effect on selection, six photos is not a per se due process violation.  Likewise, "the array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." *Id.* Finally, while the police do not have to provide "exact replicas" of the defendant's picture in the array, the array should be matched by "race, approximate age, facial hair, and a number of other characteristics."  *Id.*

The Court finds that the photo array used in this case is of six black males.  Of the six, photo 1, which is the top left photo, is of a dark complexioned male with collar length hair. Photo 2 is a light complexioned black male with braided hair past his shoulders. This photo is very close in complexion with photo number 3 which is the photo of Defendant.  Photo 4, which is the bottom left photo, is also a light complexioned

black male who also has long braided hair.  This subject's photo is lighter in complexion than photo 2 or defendants. Photo 5 is of a black male whose complexion is not as light as the others but is also not as dark as photo 1.  This subject's hair is straight and not quite down to his collar. Finally, photo 6 is of a black male who also has a lighter complexion than photo 1 but not as light as photo 4, 3 or 2. He also has braided hair that is past his shoulders.

Based upon the photo array the Court finds that the array is of black men of similar size and shape, complexion and of similar hair length.  The photos appear to be uniform as to as to background.  There is similar facial hair and no tattoos, jewelry or writing.  There are no stark contrasts that would effectively make Defendant' s photo "jump out" at the viewer. As for the complexion issue, it has been held that a lineup is not impermissibly suggestive where participant's complexions fit within a general description of the perpetrator.  *People v. Bolton*, 859 P.2d 311 (Colo. App. 1993).  Thus, the Court finds that the defendant has not met his burden of establishing impermissible suggestiveness as to the composition of the array.

Defendant also argues that the comment and discussion between Roberto Gutierrez and Esther Sanchez after they viewed the photo lineup as to who each of the witnesses selected raises the issue of an improper procedure which taints the in court identification of the Defendant.  Colorado has recognized that the knowledge that another eyewitness has identified a suspect at a different lineup does not render the photo lineup impermissibly suggestive.  *People v. Borrego*, 668 P.2d 21 (Colo. App.1983); see also, *People v. Webster*, 987 P.2d 836 (Colo. App. l998).  Likewise, comments made <u>after</u> the identification are not so impermissibly suggestive so as to taint an in court identification.  *People v. Johnson*, 653 P.2d 737 (Colo. 1982).  Therefore, Defendant's motion based on this issue is also denied.

To the extent defendant may have made a showing of impermissible suggestiveness, the Court finds based on the totality of the circumstances that the identification is nonetheless reliable.  In making this finding the Court has balanced the possible suggestiveness of the procedures employed against various indicia of reliability surrounding

the identification.  Each witness had an opportunity to view the suspect at the time of the crime.  The amount of viewing varied from what appears to be a few minutes to ten minutes.  Indeed, Esther Sanchez, who knows the Defendant immediately recognized him when he came through the door.  The other witnesses, who did not know him, nonetheless based their eventual selection of the Defendant on their opportunity to see him when he came into the house. The degree of attention of the witnesses on the night of the shooting is also evident from their description of the events and the lighting conditions in the house.  As for the accuracy of the witness's prior description of the suspect, while Tabatha White may have stated she may not be able to identify the suspect when she was being treated at the hospital, she did in fact identify the Defendant with a very high degree of accuracy according to her own evaluation of what she remembered of the suspect. Likewise, Roberto Gutierrez, while having never met the Defendant, nonetheless provided an accurate description, and then identified Defendant in the photo lineup based on what he saw the night of the shooting.  Esther Sanchez, having known the Defendant immediately recognized him when he came through the door and confronted him and pled with him "don't do this."  The level of certainty demonstrated by all three witnesses was quite high and none of them hesitated in making their selection for more than a few moments when shown the lineup.  Any varying degree of certainty goes to the weight of the evidence, not to its admissibility.  Finally, the witnesses were shown the lineup within approximately three hours to two days after the shooting, which is not an inordinate amount of time.  Thus, the totality of the circumstances does not indicate a very substantial likelihood of irreparable misidentification, and Defendant's motions to suppress are denied.

*Smith*, No. 02CR3477, Court File, at 135-141.

The federal habeas court presumes a later unexplained order upholding a judgment or rejecting the same claim by an earlier reasoned state judgment will be found to rest on the same ground.  *Ylst*, 501 U.S. at 804.  The Court, therefore, will uphold the CCA's summary decision regarding the claims not specifically addressed by

the CCA unless an independent review of the record and pertinent federal law is persuading that the state court's result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented. *Aycox*, 196 F.3d at 1178.

"[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. . . . Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, — U.S. —, 132 S. Ct. 716, 718 (2012) (internal citations omitted). When the constitutionality of a photographic array is challenged, the Due Process Clause mandates a two-pronged inquiry: first, it must be determined whether the array was impermissibly suggestive, and if so, second, it must be determined whether the identifications were nevertheless reliable in view of the totality of the circumstances. *See Simmons v. United States*, 390 U.S. 377, 384 (1968); *Johnston v. Makowski*, 823 F.2d 387, 391 (10th Cir. 1987). These two prongs must be analyzed separately, and only if it is determined that the array was impermissibly suggestive is it necessary to reach the second prong of the test. *Johnston*, 823 F.2d at 391.

If a reviewing court concludes that the identification procedure was unnecessarily suggestive and that the identification was not reliable under the totality of the circumstances, the court evaluates the erroneous admission under harmless error. *See, e.g., Biggers v. Tennessee*, 390 U.S. 404, 408–09 (1968). The constitutionality of identification procedures is a mixed question of law and fact. *Archuleta v. Kerby*, 864 F.2d 709, 710–11 (10th Cir. 1989).

23

In *Simmons*, the Supreme Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384.  To determine whether a pretrial identification was impermissibly suggestive, "courts use a number of factors . . . , including the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994) (citation omitted).

A defendant has the initial burden of proving that the identification procedure was impermissibly suggestive.  *See United States v. Wade*, 388 U.S. 218, 240 n. 31 (1967); *English v. Cody*, 241 F.3d 1279, 1282-83 (10th Cir. 2001).  It is only after the defendant meets this burden that the burden shifts to the government to prove by clear and convincing evidence that the identification was reliably independent of the suggestive procedure.  *Id.*  Absent a finding of a substantial likelihood of irreparable misidentification, the evidence set forth regarding the lineup is for the jury to weigh. *Manson v. Brathwaite*, 432 U.S. 98, 116, (1977).  "Evidence with some element of untrustworthiness is customary grist for the jury mill." *Id.*

The factors to consider whether identification testimony is admissible include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the

confrontation." *Id.* at 114.  These factors are weighed against the corrupting effect of the suggestive identification. *Id.*

Based on the above trial court findings and the Court's own review of the transcripts for the hearing, the photo identifications were not impermissibly suggestive. In the January 9, 2003 order, the trial court addressed the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves.  The trial court found that the photo array (1) was of black men of similar size and shape, complexion and of similar hair length; (2) appeared to be uniform as to background; (3) showed similar facial hair and no tattoos, jewelry or writing; and (4) had no stark contrasts that would effectively make Applicant's photo "jump out" at the viewer.  As for the complexion issue, the trial court found that it had been held that a Lineup is not impermissibly suggestive where participant's complexions fit within a general description of the perpetrator.  Finally, the CCA addressed the age concern, even though this issue was not at issue before the trial court, and found that to the extent the photographs suggest different ages, Applicant appeared to be one of the younger men, and the lineup could not be unduly suggestive in the way that Applicant contends.

Even if this Court were to find, as Applicant's trial counsel suggested, that the skin tones, hair, and complexion were so different that Applicant's photo "jumps right out from all the other photographs almost immediately," *see Smith*, No. 02CR3477, Jan. 7, 2003 Pretrial Hr'g at 120-21 (CD Numbering 5-6, as numbered on compact disc by Respondents), and the photo array is impermissibly suggestive, the identifications were nevertheless reliable in view of the totality of the circumstances.

First, each of the witnesses testified to the amount of light in the room at the time of the shooting, which indicated there was sufficient ability by each witness to see Applicant. *Id.*, Jan. 6, 2003 Pretrial Hr'g Tr. at 8-9, 30-31, and 54-56. Second, each witness provided sufficient detail as to the incident regarding (1) the individuals in the room; (2) the arrangement of people and furniture in the room; (3) the actions of the shooter and who he shot; (4) the ability to see the shooter; and (5) the description of the shooter (included other than just the face, which is all that was presented in the photo array). *Id.* at 8, 10, 12-13, 30-35, and 54-56.

Each witness was very sure applicant was the assailant when they were presented with the photo lineup and identified him either within a few hours or two days of the shooting. *Id.* at 15, 40, 79, 81, and 84. Finally, two of the witnesses provided descriptive identifications of applicant during the pretrial hearing that were not disclaimed by Applicant as being contradictory to any previous description or nondescriptive of Applicant; and one of the witnesses testified to knowing Applicant prior to the incident and to asking him at the time of the incident not to shoot the victim. *Id.* at 13, 32, and 55.

Based on the pretrial hearing testimony, by each of the three eyewitness, the identifications given were independently reliable. The Court, therefore, finds that the state court's decision regarding the suggestiveness of the photo lineups was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceedings.  Claim One, therefore, lacks merit, and Applicant is not entitled to relief.

**C.      Claim Three/ Improper Admission of Inflammatory Hearsay**

In this claim, Applicant asserts that the judge ruled the prosecution could not introduce evidence regarding Applicant's alleged act that prior to the shooting he broke the victim's arm.  ECF No. 1 at 14.  During prosecution's direct examination of Diane (Angela) Sanchez at trial, she stated twice that Applicant had broken the victim's arm prior to the shooting, *id.*, the second time was after she had been instructed not to mention the arm breaking, *id.*  Applicant contends that the trial court denied defense counsel's motion for mistrial and found the testimony concerning the broken arm was not intentionally educed by the prosecution and a jury instruction was sufficient to remedy any error.  *Id.* At 14-15.  Applicant further contends that the jury could not have reached its verdict without Ms. Sanchez's inflammatory testimony, which was "in tandem with pseudo-expert testimony concerning the propensity of offenders to violate restraining orders and escalate their level of violence." *Id.* at 15.  Applicant concludes that the highly prejudicial effects of Ms. Sanchez's statements could not be overcome by a jury instruction and he is entitled to a new and fair trial.  *Id.* at 16.

In addressing this claim, the CCA found as follows.

II. Motion for Mistrial

Before trial, the prosecution sought leave to introduce evidence of uncharged conduct -- namely, occasions when defendant had made contact with his wife in violation of a restraining order.  The trial court granted the motion but disallowed evidence that defendant had broken his wife's arm.

At trial, however, a witness ran afoul of the court's order.  In a nonresponsive answer to the prosecutor's question, the witness indicated that defendant had broken his wife's arm:

> Prosecutor:  In relationship to the time that he came into your house and was shooting, how much time had passed between her telling you that he was getting mean and that time?
>
> Witness:  I'd say about two, three weeks when she told me that he really broke her arm, that she didn't fall and get hurt.

Defense counsel objected, and the court sustained the objection. Defense counsel also made a motion for a mistrial, which was denied.

Shortly thereafter, the witness again referred to the broken arm:

> Prosecutor:  Was [the wife] upset when she was talking to you?
>
> Witness:  She just -- she just told us. She didn't say nothing bad. She just told me he broke her arm.  He's not as good as we thought he was.

Defense counsel again requested a mistrial. The court again denied this request.  It ruled:

> [G]ranting a mistrial is a very drastic remedy warranted only when the prejudice to the accused is so substantial that its effect on the jury cannot be remedied by any other means.
>
> I think we do have a remedy here.  The statement was made twice by [the witness].  I do not find that it is of such a nature that it would cause undue or substantial prejudice to the defendant, but I am going to issue an instruction to the jury that they will disregard that testimony; and that instruction will also be followed by the written instruction that the defense has requested at the end of the case.

The court instructed the jury as follows:

> Yesterday you heard [the witness] testify as to an incident regarding a broken arm.  You are instructed to disregard and ignore any testimony regarding this broken arm.  You are to delete it from your notes.  You are to delete it from your minds.  You're in no way to consider it in any way, shape, form, manner or style.  You will also receive at the end of the evidence a written instruction as to that effect.

Defendant now argues that the trial court erred in failing to declare a mistrial.  We disagree.

A mistrial is warranted only when the evidence is so prejudicial that its effect on the jury cannot be remedied by other means.  *People v. Abbott*, 690 P.2d 1263, 1269 (Colo. 1984).  A curative instruction is generally sufficient to overcome evidentiary error, and an instruction is inadequate only when evidence is so prejudicial that, but for its exposure, the jury might not have found the defendant guilty.  *People v. Gillispie*, 767 P.2d 778, 780 (Colo. App. 1988).  The trial court has broad discretion to grant or deny a mistrial, and its decision will not be disturbed on appeal absent gross abuse of discretion and prejudice to the defendant.  *Abbott*, *supra*.

Here, the court acted within its discretion in determining that the evidence was not so prejudicial as to require a mistrial.  In the context of this case, the effect of this evidence was lessened by the fact that the jury had heard, through admissible evidence, that defendant had previously threatened to kill his wife and had tried to hit her with his hand on at least one occasion.

We cannot conclude that, but for its exposure to the witness's improper statements, the jury might not have convicted defendant.  The evidence was overwhelming.  No fewer than six witnesses were in the house when the assailant entered and started shooting, and each of them testified at trial and identified defendant as the assailant.

*People of the State of Colo. v. Smith*, No. 03CA1273, 3-5 (Colo. App. Feb. 10, 2005).

"To establish a constitutional violation from improper admission of testimony, the

testimony must have been so prejudicial in the context of the proceedings as a whole

as to deprive the defendant of the fundamental fairness essential to the concept of due

process." *Saavdera v. Thomas*, 132 F.3d 43, *3 (10th Cir. Dec. 12, 1997) (unpublished) (citing *Nichols v. Sullivan*, 867 F.2d 1250, 1253-54 (10th Cir. 1989)).

During Ms. Diana Sanchez's testimony and Ms. Ester Sanchez's testimony the court gave a limiting instruction to the jury as follows:

> THE COURT:  Ladies and gentlemen [ ] you are about to hear evidence regarding other incidents that allegedly occurred on or about August 10th, 12th, and 14th of 2002. You may consider statements of these other incidents for the sole purpose of showing intent, motive or absence of mistake.  [ ] You may not consider these other incidents for any other purpose.

No. 02CR3477, Mar. 5, 2003 Jury Trial Tr. at 806 and 760 (285 and 239).

When Ms. Sanchez testified the victim told her that Applicant had broken her arm, she also testified that three weeks prior to the shooting the victim told her that Applicant was being mean to her, which was admissible testimony.  Mar. 5, 2003 Jury Trial Tr., at 808-09 (287-88).  Ms. Sanchez further stated the victim told her, while living at Ms. Sanchez's home, that she wanted to move out from where she lived with Applicant, *id.* at 809 (288), because Applicant was not as good as others thought, *id.* at 810 (289).  Ms. Sanchez further testified that the victim was upset when she told her about Applicant and that she felt safe at Ms. Sanchez's house.  *Id.*

Ms. Sanchez also testified that that about a week or two before the shooting Applicant came to her house and threatened the victim that "if she didn't stop her shit, he was going to kill her."  *Id.* at 811 (290).  Ms. Sanchez described Applicant as angry and stated that the victim had not "called him or anything."  *Id.*  Ms. Sanchez also testified she saw the restraining order that the victim had against Applicant.  *Id.* at 812 (291).  Ms. Sanchez further testified that TESSA (a domestic violence and sexual

assault agency in Denver, Mar. 6, 2003 Jury Trial Tr., at 893, testimony of Jennifer Bier, TESSA Director of Clinical Services at time of trial), wanted the victim to go to a "safe house." *Id.* at 814 (293) (34).

Ester Sanchez also testified that on one occasion prior to the shooting and while the victim was living at Ester's home, Applicant approached the victim, while she, the victim, and other members of her family were sitting in the back yard of her home, and raised his hand to hit the victim, but Ester jumped in front of the victim. Mar. 5, 2003 jury Trial Tr. at 764 (243). Ester further testified that at this time Applicant told the victim he was going to kill her because she was "messing up a contract." *Id.*

Based on Diana Sanchez's testimony and Ester Sanchez's testimony regarding other incidents that were properly before the jury to consider intent, motive or absence of mistake, and the eye-witness identification of Applicant as the assailant by at least three individuals, as addressed above, the two references by Diana Sanchez to a broken arm were not so prejudicial in the context of the proceedings as a whole as to deprive the defendant of the fundamental fairness essential to the concept of due process. The Court, therefore, finds that the state court's decision to deny a mistrial and provide an instruction to the jury to disregard the statement about the broken arm, was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Claim Three, therefore, lacks merit, and Applicant is not entitled to relief.

**D.     Claim Five/Improper Use of Prior Unconstitutional Convictions**

In this claim, Applicant asserts that the trial court denied his motion to exclude his prior convictions for the purpose of felony impeachment based on an inapplicable time-bar statute.  ECF No. 1 at 18.  Applicant contends the use of the limitations statute is only applicable to a collateral attack of a judgment and it does not serve to bar him from suppressing the government's collateral use of a prior unconstitutional conviction in a new proceeding.  *Id.*

The CCA addressed this claim as follows.

> Defendant first argues that the court erred in ruling that his motion was subject to the three year limit set forth in § 16-5-402, C.R.S. 2004.  In defendant's view, § 16-5-402 applies to collateral attacks brought under Crim. P. 35(c), but not to motions to suppress the use of prior convictions as impeachment evidence.  We disagree.
>
> When a defendant seeks to suppress the use of a prior conviction -- whether for sentencing enhancement, for impeachment, or as a predicate offense for another charge -- he makes a "collateral attack" within the meaning of § 16-5-402.  *See People v. Wiedemer*, 852 P.2d 424, 430 (Colo. 1993) (§ 16-5-402 applies to a motion to suppress a conviction that would serve a purpose such as establishing a predicate offense for some other charge); *People v. Fultz*, 761 P.2d 242 (Colo. App. 1988) (§ 16-5-402 applies to a motion to suppress a conviction that would be used to impeach the credibility of a defendant), *abrogated on other grounds by People v. Wiedemer*, *supra*.

*Smith*, No. 03CA1273, 8-9.

"It is well established that states may place reasonable time limitations on the assertion of federal rights."  *Lankford v. Novac*, 7 F. App'x 867, 868 (10th Cir. 2001) (citing *Francis v. Henderson*, 425 U.S. 536, 540-41 (1976)).  In *Marquez v. Furlong*, 60 F.3d 837 (10th Cir. July 7, 1995) (unpublished), the Tenth Circuit affirmed the District of Colorado's finding that an applicant had failed to demonstrate a violation of a federal

32

right when he asserted a due process violation based on the trial court's pretrial denial of his untimely challenge of prior convictions.  The Tenth Circuit referred to the *Wiedemer* finding that the collateral-attack time limits in § 16-5-402 are reasonable and subject to exception for justifiable excuse, thus § 16-5-402 does not violate the Fourteenth Amendment Due Process Clause.  *Id.* at 1.  The Tenth Circuit found no basis for reversing the District of Colorado's decision upholding the CCA's reliance on *Wiedemer*.

It also is well established that the denial of due process in a state criminal trial "is the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941).  In order to declare a denial of due process, the Court must find that "the absence of that fairness fatally infected the trial." *Id.*; *see also Tapia v. Tansy*, 926 F.2d 1554, 1557 (10th Cir. 1991) (due process claims entitle applicant to relief only if the alleged errors rendered the trial as a whole fundamentally unfair).

The trial court did not categorically deny Applicant's motion to exclude.  Defense counsel argued justifiable excuse, as discussed below, and sought and was granted alternate defense counsel to review the constitutionality and time bar issues raised regarding the prior convictions.  The state court's decision to deny Applicant's motion to exclude prior convictions because the motion was subject to the three-year limitation under Colo. Rev. Stat. § 16.5-402, therefore, was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court, or a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceedings.  Claim Five, therefore, lacks merit, and Applicant is not entitled to relief.

**E.     Claim Six/No *Weidemer* Analysis Conducted Regarding Prior Convictions**

In Claim Six, Applicant argues that the trial court violated his due process and impermissibly burdened his constitutional rights to testify by failing to conduct a *Wiedemer* analysis of whether a justifiable excuse existed to challenge the constitutionality of the prior convictions even though Applicant was barred by the three-year time limitation under Colo. Rev. Stat. § 14-5-402.  ECF No. 1 at 19-21.  Applicant contends that the trial judge should have considered (1) outside influences prevented a timely challenge to the prior convictions; (2) if he had reason to question the constitutionality of a conviction investigated the validity and took advantage of available avenues of relief; (3) if he knew or had reason to believe a conviction was constitutionally infirm; (4) if he had other means of preventing the government's use of the prior conviction so a challenge was unnecessary; (5) the length of time that had elapsed between the date of conviction and his challenge; and (6) the effect that such a period had on the state's ability to defend against the challenge.  *Id.*

The CCA addressed this claim as follows.

Defendant next argues that the court erred in finding that he had failed to demonstrate justifiable excuse or excusable neglect for his untimely collateral attack.  We again disagree.

As to the 1995 conviction, defendant argued that the three year limit did not begin to run until 2000, when he completed his sentence to probation.  The trial court correctly rejected this argument.  Where, as here, a defendant does not file a direct appeal, the three year period begins when sentence is imposed.  *People v. Hampton*, 857 P.2d 441, 444 (Colo. App. 1992), *aff'd*, 876 P.2d 1236 (Colo. 1994).

With regard to the 1981 conviction, defendant argued he was not informed during his 1995 trial of his right to bring a collateral attack. T-130he trial court correctly rejected this argument. Ignorance does not constitute justifiable excuse or excusable neglect. *See People v. Mershon*, 874 P.2d 1025, 1036 (Colo. 1994) (lack of knowledge about the time bar does not constitute justifiable excuse or excusable neglect as a matter of law). Moreover, even if defendant had brought a collateral attack during his 1995 trial, it would have been time barred. *See People v. Fagerholm*, 768 P.2d 689, 693 (Colo. 1989) (grace period to allow collateral attacks on convictions obtained before enactment of § 16-5-402 expired on July 1, 1989).

*Smith*, No. 03CA1272 at 9-10.

Trial counsel did assert in the motion to exclude the prior felony convictions that the delay in challenging these convictions was due to excusable neglect, and any time bar is not applicable. No. 02CR3477, Court File at 129-30 (118-19). During the pretrial hearing held on January 7, 2003, trial counsel argued that in one of the prior convictions (1981 conviction) counsel was ineffective in failing to inform applicant of his right to collaterally attack and that in the other prior conviction (1995 conviction) a collateral attack is not time-barred. January 7, 2003 Pretrial Hr'g at 140-41 (25-26). On January 9, 2003, the trial court ordered appointment of an alternate defense counsel to review the prior convictions with respect to the constitutionality and time bar issues raised, but denied the motion to exclude the use of prior felony convictions. No. 02CR3477, Court File, at 152-53 (141-42). At a pretrial hearing on February 21, 2003, alternative defense counsel reported he had nothing to add to trial counsel's argument regarding the collateral attack of the prior convictions, but after talking with Applicant would inform the Court if his findings were otherwise. Feb. 21, 2003 Pretrial Hr'g at 2.

During the trial in answer to defense counsel's question regarding further information on the motion to exclude prior felonies, the trial judge stated that he had not

35

received any further information from alternate defense counsel.  Mar. 10, 2003 Trial Tr. at 1403 (216).

"Whether a defendant has demonstrated 'justifiable excuse or excusable neglect' is a factual matter determined in accordance with state law, specifically the standards in *Wiedemer*, 852 P.2d at 441-42, and *People v. Heitzman*, 852 P.2d 443, 447-48 (Colo. 1993)."  *Lankford*, 7 F. App'x at 868.  Also, as stated above, it is well established that states may place reasonable time limitations on the assertion of federal rights.  *Id.*

In a § 2254 proceeding a determination of a factual issue made by a State court is presumed to be correct and an applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Applicant sets forth the factors considered in *Wiedemer* but fails to assert how the trial court disregarded the factors based on trial counsel's arguments.  The trial court even appointed alternate defense counsel to further address the motion to exclude prior convictions, but alternate counsel had nothing to add to trial counsel's argument.

Applicant is required to make a sufficient showing of excusable neglect to qualify for a statutory exception.  The trial court addressed trial counsel's arguments (1) that a time bar in the 1981 case is subject to excusable neglect due to ineffective assistance of counsel for failing to inform Applicant that he had a right to collaterally attack the conviction; and (2) that collateral attack in the 1995 case was still timely given the grace period under *Fagerholm*.  January 7, 2003 Pretrial Hr'g at 140-41 (25-26).  The CCA addressed the trial court's findings regarding counsel's arguments.

Based on the record, the Court finds the factual determination correct and that Applicant has failed to rebut the presumption of correctness by clear and convincing

36

evidence. As found in Claim Five, the trial court did not categorically deny Applicant's motion to exclude. Therefore, the CCA's denial of this claim, and any collateral claim that his right to testify was violated due to the court's refusal to suppress Applicant's previous convictions, was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Claim Six, therefore, lacks merit, and Applicant is not entitled to relief.

## F.    Claim Seven/Insufficient Evidence

In Claim Seven, Applicant argues that his convictions for burglary, felony murder, and violating a restraining order must be vacated because the evidence is insufficient to sustain the guilty verdicts. ECF No. 1 at 21-22. In support of this claim, Applicant contends that two restraining orders were issued against him; one was issued on August 10, 2012, by a deputy who had arrested Applicant for domestic violence; and the second one by the victim, issued pursuant to Colo. Rev. Stat. § 13-14-101, *et seq*., which was never served on Applicant. *Id.* at 21. Applicant contends that there was insufficient evidence to prove he violated the August 10 restraining order and that he was not personally served with the other restraining order pursued by the victim. *Id.* Applicant concludes that because the record is void of evidence that he personally was served on one restraining order and the other order restraining order lacked sufficient evidence to prove he had violated it, then it follows that the burglary and felony murder verdicts, which are based on the intent to commit the crime of violating "valid"

restraining orders, likewise lack sufficient evidence to sustain the guilty verdicts.  *Id.* at 22.

With respect to the insufficient evidence claim the CCA found as follows.

### VI. Sufficiency of Evidence

Defendant next challenges his convictions for burglary, felony murder, and violating a restraining order on grounds of insufficient evidence.  He argues that the evidence was insufficient because the prosecution failed to prove that the order was an "effective legal order." We disagree.

The prosecution introduced into evidence copies of two restraining orders, each ordering defendant to stay away from any location where his wife was likely to be found.  These orders, which were properly completed and signed by both defendant and a judge, constitute prima facie evidence that a valid and effective restraining order was in effect. Defendant did not dispute the validity of these orders at trial.

*Smith*, No. 03CA1273 at 10-11.

The standard for sufficiency of the evidence, which was clearly established when Applicant was convicted, is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  In *Jackson*, the Supreme Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319.  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.*

This standard reflects the "longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial."  *Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004).  The Court's review

under this standard is " 'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' "  *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992)).

Sufficiency of the evidence is a mixed question of law and fact.  *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006).  *Maynard* further states that the inquiry is not simply dealt with under 28 U.S.C. § 2254(d)(1) as *McKune* indicates, but requires applying both subsections (d)(1) and (d)(2) of § 2254 to determine whether the facts are correct and the law was properly applied to the facts.  *Id.* (citing *Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006); *Hale v. Gibson*, 227 F.3d 1298, 1335 n. 17 (10th Cir. 2000) (noting precedent has investigated sufficiency of the evidence both as a legal question and as a factual question).  The Court also must defer to any determination of factual issue by the state court due to the presumption of correctness afforded by § 2254(e), and Applicant must show by clear and convincing evidence that the state court's decision was an unreasonable determination of the facts.  *Fields v. Gibson*, 277 F.3d 1203, 1221 (10th Cir. 2002).

There were two issues before the CCA, which now are presented in this claim. The first issue is whether sufficient evidence existed to prove Applicant violated the August 11, 2002 restraining order, because pursuant to § 18-1-1001 the order is not effective until a person is advised of his rights at arraignment or his first appearance before the court and is informed of the order.  ECF No. 11-2, Opening Brief on Direct, Ex. B at 34-35; ECF No. 1. at 21-22.

The prosecution entered two exhibits, Exhibit Nos. 75 and 76. *See* Case No. 02CR3477, People's Exhibits (CD Numbering 66 and 67); Mar. 10, 2003 Trial Tr. at 1303 and 1314 (116 and 127). Exhibit No. 75 is a restraining order signed by Applicant and entered by the El Paso County Court on August 11, 2002, that was in effect until August 14, 2002. *See* People's Exhibits. During El Paso County Deputy Sheriff Aaron Lee Baker's testimony, Exhibit No. 75 was entered on the record, without contest or cross-examination by trial counsel regarding Deputy Baker's statement that Applicant signed the restraining order on August 11, 2002, the day after being arrested for harassment, domestic violence, and criminal mischief involving the victim, Mar. 10, 2003 Trial Tr. at 1303-04 (116-17).

Exhibit No. 76 is a restraining order signed by Applicant and entered by the El Paso County District Court on August 17, 2002, that was in effect until midnight August 21, 2002. Case No. 02CR3477, People's Exhibits (67). During Colorado Springs Police Officer John Surma's testimony, Exhibit No. 76 was entered on the record, without contest or cross-examination by trial counsel regarding the date the restraining order was signed. Mar. 10, 2003 Trial Tr. at 1314-15 (127-28).

There was testimony by Mr. Surma that Applicant had violated the August 11 restraining order on August 12, 2002. *Id.* at 1305-1311 (118-24); and there was further testimony by Colorado Springs Police Officer Mark James Garcia that applicant had violated the August 11 restraining order on August 14, 2002. *Id.* at 1316-21 (129-34).

With respect to both restraining orders and the testimony given regarding the incidents that took place on August 10, which led to Applicant's arrest and the first restraining order to be entered, and the subsequent events on August 12 and 14, 2002,

the jury was instructed to consider the statements regarding the incidents for the sole

purpose of showing intent, motive or absence of mistake and for no other purpose. *Id.*

at 1294 (107) and 1307 (120).

Applicant concedes that the August 11 and 17, 2002 restraining orders pursuant

to Colo. Rev. Stat. § 18-1-1001, were entered and expired on August 14 and 21, 2002

respectively; Applicant does not deny he signed the orders. *See* ECF No. 1 at 21-22.

 After reviewing the trial transcripts and people's exhibits, with particular detail,

as noted above, the Court finds evidence of the August 11 restraining order, and

subsequent violations of this order, were properly before the jury as prior incidents to

show intent, motive or absence of mistake for the jury to weigh and to draw reasonable

inferences. *Turrentine*, 390 F.3d at 1197. Therefore, the CCA's determination that the

August 11 and 14, 2002 restraining orders were properly completed and signed by both

defendant and a judge, was not contrary to or an unreasonable application of any

clearly established rule of federal law as determined by the U.S. Supreme Court, and

was not an unreasonable determination of the facts in light of the evidence presented in

the State court proceedings. Likewise, the CCA's determination that each order,

especially the August 11 order, constituted prima facie evidence that a valid and

effective restraining order was in effect, was not contrary to or an unreasonable

application of any clearly established rule of federal law as determined by the U.S.

Supreme Court, and was not an unreasonable determination of the facts in light of the

evidence presented in the State court proceedings.

The second issue involves the temporary civil restraining order that the victim

sought, which was entered on August 14, 2002, and was scheduled for hearing on

August 28, 2002.  *See Smith*, No. 2002CR3477, People's Ex. 66 (55-56) (This exhibit was entered on the record, *see* Mar. 10, 2003 Trial Tr. at 1364 (177), without objection by trial counsel, *id.* at 1365 (178)).  Applicant claims that he was not personally served with Exhibit No. 66; and without personal service or acquired knowledge of the order from the court or law enforcement, as required under Colo. Rev. Stat. § 18-6-803.5(1), the evidence is insufficient to convict him of violation of the August 14 order.  ECF No. 1 at 21.  Applicant also argues in the Traverse, that without knowledge of the order he did not violate a restraining order or commit burglary and even if he was the one who committed the offense it is reasonable that he shot the victim only after he confronted her and she struck him, which is second degree murder.  ECF No. 47 at 13.  Applicant further asserts in the Application that Deputy Garcia testified "definitively" Applicant had not been personally served with the August 14 order.  ECF No. 1 at 21.

Deputy Garcia testified that on August 14, 2002, he was dispatched to the victim's house to investigate a violation of a court order, which was a no contact order entered against Applicant when he was released from jail.  Mar. 10, 2003 Trial Tr. at 1317 (130).  Mr. Garcia further testified that when he talked with the victim on August 14 she told him there was a restraining order against Applicant that had not been served yet; but there was an active no-contact order.  *Id.* at 1317-18 (130-31).  Nothing in Mr. Garcia's testimony supports Applicant's argument that on August 27, 2002, the date the shooting took place, he had not been personally served or did not have actual notice of the August 14, 2002 temporary civil restraining order or the pending August 28, 2002 hearing.

42

Furthermore, Matthew Mack testified that on August 27, 2002, Applicant was aware that he had a restraining order against him and he was not to have any contact with the victim.  Mar. 6, 2003 Trial Tr. at 1108-09 (249-50).  Moreover, Rhonda Taken-Alive testified that on August 27, 2002, at about 10:15 p.m. she received a call from the Applicant during which he stated he had to go to court with the victim the next morning at 8:00 a.m.  *Id.* at 1142.

As stated above in the Legal Standards section of this Order, even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.  In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated."  *Aycox*, 196 F.3d at 1177.  Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented."  *Id.* at 1178.  "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims."  *Id.*

The CCA does not specifically address the restraining order found in Exhibit No. 66, of which Applicant claims he had no personal knowledge and, therefore, could not have been guilty of violating a restraining order, committing burglary, of felony murder. The CCA, however, did deny the sufficiency of the evidence claim as it pertained to Applicant's  burglary, felony murder, and violating a restraining order convictions.

43

Pursuant to *Aycox*, this Court must uphold the state court's summary decision unless the Court is persuaded from an independent review of the record and pertinent federal law persuades that the state court results contravene or unreasonably apply clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented.

Furthermore, the credibility of a witness is entirely within the province of the jury and "virtually unreviewable on appeal."  *See United States v. Bass*, 661 F.3d 1299, 1307 (10th Cir. 2011) (quoting *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th  Cir. 2003) (internal quotation marks omitted).  A witness's testimony is disregarded only if "it is unbelievable on its face," in other words if it asserts "facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature."  *Bass*, 661 F.3d at 1307-08 (quoting *Virgen-Chavarin*, 350 F.3d at 1134) (internal quotation marks omitted).

Before the jury was (1) Mr. Garcia's testimony, which, contrary to Applicant's claim, does not include a definitive statement that on August 27, 2002, Applicant did not know of a pending hearing on August 28, 2002; (2) Mr. Mack's testimony that Applicant did know on August 27, 2002, he was subject to a restraining order; and (3) Ms. Taken-Alive's testimony that on August 27, 2002, Applicant told her he had to go to court with the victim at 8:00 a.m. the next morning.  It was the "jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial."  *Turrentine*, 390 F.3d at 1197.  The evidence was sufficient to support a finding that Applicant was aware of the restraining order and as a result violated the order and committed burglary and felony murder.  Applicant, therefore, has not rebutted the state

court's factual findings by clear and convincing evidence; and the Court finds a basis for upholding the CCA's summary decision as it may pertain to Exhibit No. 66.

Based on the evidence before the jury regarding all restraining orders, this Court finds that the CCA's denial of Applicant's insufficiency of the evidence claim does not contravene or unreasonably apply clearly established federal law, or is the denial based on an unreasonable determination of the facts in light of the evidence the presented. Claim Seven, therefore, lacks merit, and Applicant is not entitled to relief.

**G.      Claim Eight/Improper Sentence for Offense of Attempted Felony Murder**

Applicant and Respondents agree that this claim should be denied as moot. ECF No. 37 at 37-38; ECF No. 47 at 14, and Applicant voluntarily dismisses the claim. ECF No. 47 at 14.

**H.      Claim Nine/Ineffective Assistance of Appellate Counsel**

Applicant asserts that appellate counsel was ineffective when he failed to raise a *Crawford* claim on direct appeal, especially because there was eleven months from when *Crawford* was decided until the CCA denied Applicant's appeal.  ECF No. 1 at 22-23.  Applicant further states in his Traverse that he only is challenging the police officer testimony that the CCA held was harmless.  ECF No. 47 at 17.  He also contends that had his appellate counsel raised the *Crawford* issue in the direct appeal prior to his conviction becoming final he would have "posted" the argument to the U.S. Supreme Court, and his case, rather than the *Giles* case, would have been reviewed by the Supreme Court.  *Id.*

In addressing this claim, the CCA found as follows.

## A. Appellate Counsel

Defendant contends the postconviction court erred when it denied his ineffective assistance of counsel claim premised on appellate counsel's failure to submit an amended opening brief after the United States Supreme Court issued its opinion in *Crawford v. Washington*, 541 U.S. 36 (2004).  We discern no basis for reversal.

In *Crawford*, the United States Supreme Court held that admitting testimonial hearsay against a defendant violates his or her right to confrontation under the Sixth Amendment of the United States Constitution unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the declarant.  *Id.* at 68-69; *see also People v. Vigil*, 127 P.3d 916, 921 (Colo. 2006).

"Testimonial" is not clearly defined in Crawford, but some guidance is provided.  The Supreme Court held that statements are considered testimonial if the declarant made them at a "preliminary hearing, before a grand jury, or at a former trial; and [in] police interrogations."  *Crawford*, 541 U.S. at 68.  Generally, statements are considered testimonial "if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."  *United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005); *see also Compan v. People*, 121 P.3d 876, 880 (Colo. 2005).

Here, the contested testimony pertained to statements made by the deceased victim to a friend and to police officers.

. . . .

## 2. Police Officers' Testimony

Deputy Baker testified to having the following conversation with the victim when he was dispatched to the Smiths' home following reports of a verbal altercation:

Q:  [D]id you make contact with [the victim]?

A :  I did.

Q:  Did you get a sense of her demeanor then?

A:  Yes, she was extremely upset. She told me that

> [defendant] had been accusing her of sleeping around, said that she was out all night with some Mexicans and that he was upset with her, told her that she should have been home.  [The victim] told me during the argument he had threatened to knock her down if she didn't tell him where she had been all night.
>
> During the conversation she also said that . . . [defendant] had cursed at her, calling her a bitch, a whore, slut and a cunt.

Officer Suma [sic] testified to having the following conversation with the victim when he went to investigate a call asserting that defendant had violated a restraining order:

> Q:  And what did [the victim] tell you had happened?
>
> A:  She advised that her husband -- her ex-husband, [defendant], had just been over at the house and in doing so had violated a restraining order that was in effect against him.
>
> Q:  Did she give any details about what had occurred at the home?
>
> . . . .
>
> A:  Initially she advised that she received two phone calls from [defendant] at approximately 8:30 p.m. and 9:30 p.m. and he kept repeating, "Why are you doing this to me?"  At approximately 9:40 p.m. he arrived at the home and spoke directly with her and asked her if she needed any money.  At this point she advised that she was calling the police.  And [defendant] said, "If you call the police, I'll get sent away for two years," and at this point he left the scene.

Officer Garcia testified to having the following conversation with the victim while investigating whether defendant had violated the restraining order:

> Q:  Can you tell us what happened once you got there?
>
> A:  Yes, ma'am.  Upon my arrival I contacted [the victim], who stated she had a restraining order against [defendant], but it had not been served yet by the El

47

Paso County Sheriff's Office and that she had been informed by the El Paso County Sheriff's Office that there was an active restraining order, a no-contact order for 72 hours after he was released from CJC, Criminal Justice Center.

Q:  Did she give you any indication what had occurred that evening?

A:  She had stated that [defendant] had stopped by without her permission and that he had called three times from his cell phone on that day.

Q:  And did she give you any indication that had occurred just previously to you being called or had it occurred earlier in the day?

A:  It had occurred earlier in the day.  There was another incident that occurred on the 12th also.

Q:  And that officers had been summoned to that address on the 12th too?

A:  Yes, ma'am, and that she also had a copy of the domestic violence report.

Q:  Let's stick with just the August 14th.  Did she say what happened once [defendant] got there?

A:  She stated that at approximately 3:30 in the afternoon [defendant] had arrived at the house without permission and that he had threatened to kill her if she had gotten him in any further trouble with the police.

The postconviction court found that the victim's statements to law enforcement officials were testimonial, and the admission of the testimony denied defendant his due process right to confrontation.

However, the postconviction court relied on *Vasquez v. People*, 173 P.3d 1099 (Colo. 2007), to conclude that defendant had forfeited his right to confrontation.  *Vasquez* holds that, "where . . . (1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to deprive the criminal justice system of evidence, the defendant then forfeits his right to [confrontation]."  *Id.* at 1104.

A year after *Vasquez* was announced, the United States Supreme Court clarified its position on the forfeiture doctrine, and explained that forfeiture by wrongdoing is an exception to the right to confrontation only where the defendant acted with the intent to prevent the declarant from testifying. *Giles*, 554 U.S. at 361. "[W]here the evidence suggest[s] that the defendant . . . caused a person to be absent, but [did] not [do] so to prevent the person from testifying - as in the typical murder case involving accusatorial statements by the victim - the testimony [i]s excluded unless it was confronted or fell within the dying-declarations exception." *Id.* at 361-62. Statements are admissible under the forfeiture doctrine only where the defendant's "wrong" was designed to prevent a witness from testifying. *Id.* at 365.

However, in so holding, the Court nevertheless highlighted the relevance of domestic violence evidence:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution - rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id.* at 377.

Defendant contends that, because there was no evidence he had been served with notice of the August 28, 2002 restraining order hearing, the record does not support the court's finding that "defendant and the victim had ongoing legal matters (restraining orders) that were aggravating to defendant, and because of these issues he 'procured' her unavailability by killing her."

We need not address whether defendant's actions were sufficient to satisfy the intent requirement of *Giles* because defendant is unable to show that he was prejudiced by appellate counsel's failure to raise the *Crawford* issues on appeal. *See Davis v. People*, 871 P.2d 769, 781 (Colo. 1994) ("[A] court is not required to first determine whether counsel's

performance is constitutionally deficient, for if the defendant fails to make an affirmative demonstration of prejudice, then the court may resolve the claim on that basis alone." (quoting *People v. Garcia*, 815 P.2d 937, 941 (Colo. 1991))).

Here, in assessing prejudice from counsel's error the inquiry is whether, but for counsel's deficient performance, a reasonable probability exists that the outcome of the appeal would have been different. *Valdez*, 178 P.3d at 1278.

We cannot conclude that, but for counsel's failure to address the *Crawford* issues presented in the postconviction proceedings, the outcome of defendant's appeal would have been different. Defendant's only theory of defense at trial was misidentification, and that he was not the shooter. We agree with the division in *Smith I* that the People presented overwhelming evidence to rebut this theory and establish defendant's guilt, including the following:

• Witness Ester Sanchez was present in Diane Sanchez's home when the victim was killed there. She had known defendant for a number of years, referred to him as "Uncle," and identified defendant as the shooter both in the 911 call she made at the time of the shooting and at trial.

• Witness Diane Sanchez was present in her home when the victim was killed there. This witness had known defendant for more than twenty years, and identified his voice as the voice of the shooter.

• Witness Tabatha White was present in Diane Sanchez's home when the victim was killed there. This witness was also shot three times. She had not met defendant previously, but she picked his photograph out of a picture array two days after the shooting and identified him as the shooter at trial.

• Witness Roberto Gutierrez was present in Diane Sanchez's home when the victim was killed there. This witness was shot in the shoulder. Although he had not met defendant before the shooting, he later picked defendant's photograph out of a picture array and identified him as the shooter at trial.

• Witness Anthony Sanchez was present in Diane Sanchez's home the night the victim was killed there. At trial, he identified defendant as the shooter.

• Witness Jose Sanchez was present in Diane Sanchez's home the night the victim was killed there.  At trial, he identified defendant as the shooter.

Given the overwhelming evidence of defendant's guilt, we conclude that any error in the admission of the victim's statements through the police officers' testimony would have been harmless beyond a reasonable doubt and would not have resulted in reversal of such error had been asserted on direct appeal.  *See People v. Fry*, 92 P.3d 970, 980 (Colo. 2004) (Confrontation Clause violations are trial errors; trial errors require reversal unless an appellate court determines that the error was harmless beyond a reasonable doubt).  Thus, defendant cannot demonstrate that he was prejudiced by any error in counsel's failure to assert a Confrontation Clause argument based on *Crawford* on direct appeal.

*Smith*, No. 10CA0098, 3-15 (Colo. App. July 5, 2012).

It was clearly established when Applicant was convicted that a defendant has a right to effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* is the clearly established federal law applicable to an ineffective assistance of an appellate counsel claim.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding "[t]he proper standard for evaluating [a] claim that appellate counsel was ineffective . . .  is that enunciated in *Strickland*. . . .")).

To establish that counsel was ineffective, Applicant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense.  *See Strickland* 466 U.S. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within a 'wide range' of reasonable professional assistance."  *United States v. Rushin*, 642 F.3d 1299, 1306 (10th Cir. 2011) (quoting *Richter*, 131 S. Ct. at 787 (2011) (citation omitted).

It is an applicant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances, *see Strickland*, 466 U.S. at 689, and that the errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' " *Rushin*, 642 F.3d at 1307 (quoting *Richter*, 562 U.S. at 104) (emphasis and citation omitted).  An applicant must show counsel failed to act "reasonabl[y] considering all the circumstances." *Cullen v. Pinholster*, 563 U.S. 170, ---, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688).

Under the prejudice prong, an applicant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  In assessing prejudice under *Strickland* the question is whether it is reasonably likely the result would have been different. *Richter*, 562 U.S. at 111.  "The likelihood of a different result must be substantial, not just conceivable." *Id.* (citing *Strickland*, 466 U.S. at 693.)

Furthermore, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard," which is the question asked "on direct review of a criminal conviction in a United States district court." *Richter*, 562 U.S. at 101.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 105.

If Applicant fails to satisfy either prong of the *Strickland* test, the ineffective assistance of counsel claim must be dismissed.  *See Strickland* 466 U.S. at 697.  Also, ineffective assistance of counsel claims are mixed questions of law and fact.  *See id*. at 698.  Pursuant to § 2254(e)(1), the factual findings of the state courts are presumed correct.  Applicant bears the burden of rebutting this presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

The CCA discussed at length the application of *Giles* to the testimony by friends and police officers.  *Giles*, however, does not apply to this case because the decision in *Giles* was issued in 2008 over three years after Applicant's conviction became final .  *See Garrett v. Raemisch*, 601 F. App'x 650, 653 (10th Cir. 2015) (An applicant must show pursuant to *Williams v. Taylor*, 529 U.S. 362 (2000), that the "state court decision contravened a rule of law that was clearly established at the time his state-court conviction became final." (internal quotation marks omitted)).  Nonetheless, the CCA opted to deny Applicant's ineffective assistance of appellate counsel claim because Applicant was unable to show that he was prejudiced by appellate counsel's failure to raise the *Crawford* issue on appeal rather than whether Applicant's actions were sufficient to satisfy the intent requirement of *Giles*.

Based on the overwhelming totality of the evidence as noted in the CCA's decision and by this Court's own review of the record, Applicant has failed to demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Six individuals were able to identify Applicant either by seeing or hearing him at the time of the shooting.  One of the

individuals who saw Applicant commit the shootings had known him for a number of years, referred to him as uncle, and stated his name in the 911 call she made.

The Court, therefore, finds that the state court's decision to deny Applicant's ineffective assistance of counsel claim based on lack of prejudice was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.[2]  Claim Nine, therefore, lacks merit, and Applicant is not entitled to relief.

**I.      Claim Ten/*Crawford* Issue**

In the Traverse, Applicant states that he is voluntarily dismissing this claim because his conviction was final prior to *Giles v. California*, 554 U.S. 353 (2008).

**J.      Claim Eleven/Ineffective Assistance of Trial Counsel**

As stated above under the Court's discussion of Claim Nine, it was clearly established when Applicant was convicted that a defendant has a Sixth Amendment right to the effective assistance of counsel.  *See Strickland*, 466 U.S. at 668.  To establish that counsel was ineffective, Applicant must demonstrate both that counsel's

---

[2] The Court does not consider Applicant's claim that he would have pursued review in the U.S. Supreme Court of a *Crawford* claim, if the claim had been presented to and denied by the CCA and that his case would have been granted certiorari review rather than *Giles*. Because this argument is raised for the first time in Applicant's Traverse, the pleading is an improper grounds for relief.  *See Loggins v. Hannigan*, 45 F. App'x 846, 849 (10th Cir. 2002), *cert. denied*, 133 S. Ct. 42 (U.S. June 25, 2012) (No. 11-10302) (citing *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (holding that a traverse is not the proper pleading to raise additional grounds from relief)); *see Jordan v. Wiley*, 411 F. App'x 201, 212 n. 9 (10th Cir. 2011) (Rule 59(e) motion cannot be used to expand a judgment to encompass new issues).  The claim also (1) is conclusory and insufficient to warrant habeas relief, *Humphreys v. Gibson*, 261 F.3d 1016, 1022 n.2 (10th Cir. 2001); (2) was not raised in Applicant's opening brief in his appeal of the denial of his Rule 35(c) postconviction motion; and (3) would be denied on the merits because Applicant fails to assert he was prejudiced by appellate counsel's refusal to raise the *Crawford* claim on appeal.

performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense. *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is "a strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* It is Applicant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances. *Id.*

"For counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999). Furthermore, "because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (Citation omitted).

Under the prejudice prong, Applicant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In determining whether Applicant has established prejudice, the Court must look at the totality of the evidence and not just the evidence that is helpful to Applicant. *See Boyd*, 179 F.3d at 914.

If Applicant fails to satisfy either prong of the Strickland test, the ineffective assistance of counsel claims must be dismissed. *See Strickland*, 466 U.S. at 697. Furthermore, conclusory allegations that counsel was ineffective are not sufficient to warrant habeas relief. *See Humphreys*, 261 F.3d at 1022 n.2.

     **i.**     **Failure to Investigate and Present Evidence**

In this claim, Applicant asserts that trial counsel was ineffective for not investigating and presenting evidence that he rescued his wife from a prescription drug overdose prior to the shooting.  ECF No. 1 at 28.  Applicant contends that this evidence would have rebutted the prosecution's theory that Applicant premeditated his wife's murder.  *Id.*  Applicant further contends trial counsel stipulated that this evidence would not be admitted unless Applicant testified; but the evidence could have been admitted otherwise through the victim's medical records, which were available because the records were disclosed to the district attorney.  *Id.*  Finally, Applicant asserts that another person was present when Applicant discovered his unconscious wife, but trial counsel elected not to have this person testify.  *Id.*

In the Traverse, Applicant further asserts that trial counsel should have presented the suicide attempt evidence, along with evidence that the shooting was committed by someone else as a result of a drug debt owed by the victim.  ECF No. 47 at 21.

The CCA addressed this claim as follows:

### 1. Victim's Suicide Attempts

Because of the difficulties inherent in evaluating an attorney's conduct without relying on the distorting effects of hindsight, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Thus, in any ineffective assistance case, "a particular decision . . . must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.

Mere disagreement as to trial strategy will not support a claim of ineffectiveness.  *People v. Bossert*, 722 P.2d 998, 1010 (Colo. 1986).

The decision to call a particular witness at trial is a tactical decision, and thus, rests within the discretion of trial counsel. *Davis* [*v. People*, 871 P.2d 769, 773 (Colo. 1994)]. Trial counsel's decision not to call certain witnesses is bolstered where such testimony would open the door to presentation of damaging evidence by the prosecution. *Id.*

Here, trial counsel testified at the postconviction hearing that she investigated defendant's claim that he rescued his wife from a drug overdose, but decided not to present such evidence at trial. Trial counsel testified that the length of time between the victim's overdose and the shooting was significant, and thus affected the probative value of the evidence. According to her testimony, trial counsel believed that defendant would likely have to testify to succeed in admitting his state-of-mind evidence, but recommended against defendant taking the stand because his testimony would allow the People to introduce other incriminating evidence. Moreover, despite defense counsel's opposition, the trial court granted the People's motion in limine to exclude any evidence that the victim was suicidal because of its minimal probative value.

In light of this evidence, we perceive no error in the postconviction court's finding that trial counsel's decision to advise defendant not to testify was a reasonable strategic decision and did not fall outside the range of reasonable professional assistance. Indeed, after the trial court granted the motion in limine, defense counsel was prohibited from presenting evidence that the victim was suicidal.

*Smith*, No. 10CA0098 at 16-18.

"The duty to investigate derives from counsel's basic function . . . to make the adversarial testing process work in the particular case." *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (citations and internal quotation marks omitted). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (internal quotation marks omitted). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations

or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690-91.

The Court has reviewed the state court transcripts for the evidentiary hearing held in his Rule 35(c) postconviction motion proceeding.  Nov. 23, 2009 Postconviction Hr'g Tr.  Applicant's claim that trial counsel was ineffective in not thoroughly investigating the law and facts regarding the victim's suicide attempt is not supported by the Rule 35(c) evidentiary hearing record.  First, contrary to Applicant's claim that the victim's suicide attempt was within two weeks of the shooting, Applicant stated during the Rule 35(c) hearing that "[i]t was close to around somewhere within six months or so, or less."  *Id.* at 28.

Furthermore, during the hearing Applicant states he told trial counsel that Maurice Cooper, LaShawn Moffitt, and Mitch Lewis were witnesses to the suicide attempt, but counsel did not interview them.  *Id.* at 28-29.  Trial counsel testified at the Rule 35(c) hearing that she did interview family members, Maurice Cooper and Mitch Lewis, regarding the suicide attempt and they provided information to counsel relevant to Applicant's state of mind regarding his wife, *id.* at 110; but she opted not to introduce the evidence because Applicant most likely would have had to testify to succeed in introducing the state-of-mind evidence, *id.* at 111.  The trial court, however, granted a motion in limine for the prosecution that prohibited the introduction of the suicide attempt.  *Id.* at 143-44.

Trial counsel further stated during the hearing that it would have been an uphill battle regarding the admissibility of the evidence because the length of time between the shooting and the suicide attempt.  *Id.* at 111.  Counsel also stated it was too risky

because if Applicant testified the prosecution would be able to admit the recorded 911 calls made by the victim at previous domestic violence incidents.  *Id.* at 112.

Finally, with respect to Applicant's drug debt theory, trial counsel testified that she indeed investigated this theory, talked with individuals Applicant identified, but could not find anyone that knew the victim was dealing drugs.  *Id.* at 106-07.  Counsel also stated she attempted to retain an expert in misidentification but she declined to assist.  *Id.* at 116.  Trial counsel further stated that there was no one who would give Applicant an alibi at the time of the shooting and that no alternate suspect was ever identified.  *Id.* at 106, 129, and 145.  It was also established at the Rule 35(c) hearing that (1) the victim's medical records were denied because the victim's estate claimed doctor/patient privilege; (2) the trial court had access to the medical records not the district attorney; (3) trial counsel believed she had not viewed the medical records; and (4) trial counsel had to confess in part to the motion in limine regarding the reselling of drugs because she had no evidence that the victim was selling drugs.
*Id.* at 108 and 122.

Based on the testimony and evidence before the state trial court at the Rule 35(c) hearing, regarding Applicant's state-of-mind at the victim's suicide attempt and the use of this evidence, along with investigative attempts to pursue Applicant's theory that someone else shot the victim, this Court finds that the factual findings relied on by the trial court are presumed correct in this federal habeas proceeding and are supported by the state court record.  Nov. 23, 2009 Postconviction Hr'g Tr. At 1-64; Court File, Order Re: Crim. P. Rule 35(c) Motion, at 539-41.

Because Applicant does not point to any clear and convincing evidence to the contrary, the Court finds that Applicant has not demonstrated a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland* at 694.

Even if trial counsel was ineffective in not conducting a reasonable investigation and interviewing witnesses that would support a misidentification defense or lack of premeditation, Applicant fails to assert how he was prejudiced by trial counsel's conduct. Applicant does not assert what trial counsel would have discovered if she had been able to identify and interview witnesses who knew of the victim's alleged drug debt that would support a misidentification defense. Moreover, in light of the overwhelming evidence presented in the state court proceedings that Applicant committed the offense on August 27, 2002, the CCA's determination was reasonable.

Based on the above findings, the CCA decision regarding Applicant's claim that trial counsel failed to investigate and present evidence about his rescue of his wife in her suicide attempt, which Applicant claims could have come in through the victim's medical records, and that counsel failed to properly investigate the misidentification defense claim, did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Eleven(i), therefore, lacks merit, and Applicant is not entitled to relief.

      **ii.**    **Failure to Object to Elicitation of Expert Opinion**

In this claim, Applicant asserts that trial counsel was ineffective for failing to object to the prosecution eliciting an expert opinion from Ms. Bier, a domestic violence expert, without qualifying her as an expert witness.  ECF No. 1 at 28.  Applicant further contends that during the postconviction evidentiary hearing trial counsel did not identify her failure to object as a strategic decision; and as a result there is no evidence that counsel made a "strategic decision" to not object.  *Id.*

Applicant also contends that because trial counsel failed to object to Ms. Bier's testimony as a domestic violence expert without being qualified as such, Ms. Bier was allowed to testify at length regarding (1) the procedure for obtaining a restraining order in Colorado; (2) how victims sometimes are manipulated by offenders to not follow through with a restraining order; and (3) how victims worry about how the offender will feel when served with the order.  *Id.* at 28-29.  Applicant further contends that trial counsel made only one objection to the testimony based on hearsay, which was overruled; and Ms. Bier was allowed to testify about the restraining order procedure, even though Applicant did not know a restraining order had been entered against him and he had not tried to manipulate the legal system.  *Id.* at 29.  Applicant also asserts that trial counsel did not object to testimony about how an offender may try to bribe a victim to drop the order or about how when a victim moves out the husband escalates the behavior.  *Id.*

Applicant further contends that Ms. Bier's testimony only could have been admitted pursuant to Rule 702 of the Colorado Rules of Evidence; but the evidence was allowed without qualifying Ms. Bier as a witness and without her having helped the victim prepare the restraining order or talked to her and not having talked with Applicant

about how he felt.  *Id.*  Applicant further asserts that trial counsel failed to request a

hearing before trial to contest Ms. Bier's testimony on the basis that expert testimony is

only admissible in a domestic violence case to explain why a victim would recant.  *Id.* at

30.  Finally, Applicant contends that Ms. Bier's testimony was inadmissible under Colo.

R. Evid. 403 and prejudiced him.  *Id.*

In the Traverse, Applicant asserts that trial counsel was allowed under *People v.*

*Shreck*, 22 P.3d 68 (Colo. 2001), to challenge Ms. Bier's testimony and the

prosecution's theory of motive, but failed to do so.  ECF No. 47 at 24.  Applicant further

asserts in the Traverse that had trial counsel obtained an expert most likely the expert

would have testified that the victim "made up" the accounts of prior domestic abuse and

that there is a substantial step between an alleged domestic abuse incident and

murder.  *Id.*  The CCA addressed this issue as follows.

## 2. Expert Testimony

Defendant further contends trial counsel was ineffective for failing
to object when the prosecution elicited an expert opinion from Jennifer
Bier, a domestic violence expert, without offering her as an expert witness,
in violation of CRE 702.  We conclude the postconviction court did not err
in rejecting defendant's assertion of ineffectiveness.

Under the two-part test set forth in *Strickland*, where a defendant
alleges ineffective assistance of counsel based on allegations of error
raised and rejected under a plain error prejudice analysis on direct appeal,
the claims of ineffective assistance of counsel must fail.  *People v.*
*Villarreal*, 231 P.3d 29, 34 (Colo. App. 2009) (*cert. granted* May 24, 2010).

In Smith I, defendant argued that the admission of Bier's opinion
testimony, without first qualifying her as an expert witness under CRE
702, constituted plain error.  The division in Smith I rejected this position,
and concluded:

The trial court did not commit plain error.  The witness did
not discuss defendant or the victims in this case.  Rather,

> she related more general observations about domestic
> violence cases.
>
> . . . .
>
> In light of the overwhelming evidence in this case, we cannot
> say that this evidence so undermined the fundamental
> fairness of the trial as to cast serious doubt on the reliability
> of defendant's conviction.
>
> Thus, under *Villarreal*, we conclude the trial court did not err in
> rejecting defendant's assertion of ineffectiveness based on counsel's
> failure to object to Bier's testimony.
>
> Defendant also argues that counsel's failure to request a pretrial
> *Shreck* hearing to challenge Bier's testimony amounted to ineffective
> assistance of counsel.  Again, we disagree.
>
> Assuming, without deciding, that Bier's testimony would have been
> excluded had trial counsel requested and received a *Shreck* hearing,
> defendant cannot establish he was prejudiced by counsel's omission.
> Bier testified about her general observations when working with
> perpetrators and victims of domestic violence.  She did not hypothesize
> about how defendant would have acted after being served with a
> restraining order.  Aside from Bier's testimony, the People presented
> overwhelming evidence of defendant's guilt through the testimony of six
> witnesses who were present when the victim was killed, all of whom
> identified defendant as the shooter.
>
> Thus, defendant is unable to make an affirmative showing of
> prejudice as to these claims.  We therefore need not consider whether
>
> counsel's acts or omissions amounted to constitutionally deficient
> representation.  *See Villarreal*, 231 P.3d at 34.

*Smith,* No. 10CA0098 at 18-20.

Trial counsel testified at the Rule 35(c) hearing that she does not believe the

domestic violence expert's speech regarding the cycle of violence was any more

damaging to Applicant than the introduction of the previous domestic violence incidents.

Nov. 23, 2009 Postconviction Hr'g at 117-18.  She concedes she did not consider

obtaining an expert witness to rebut the expert; but she states that she did not know of

anyone who would testify differently given the facts to the case. *Id.* at 117-18 and 158-59; ECF No. Counsel also testified that this was not a case where a *Schreck* analysis was proper and that she did not file a pretrial motion challenging the testimony. *Id.* at 118.

Counsel also stated that it is best just to challenge the underlying allegations regarding the restraining order violations and the prior domestic violence incidents, especially since once it was ruled that the prior domestic violence incidents were to be heard by the jury the expert is going to get to testify. *Id.* at 159. Counsel's strategy was to focus on keeping the other domestic violence cases separate because they were minor and would not equate to a motive for homicide. *Id.*

Based on the testimony and evidence before the state trial court at the Rule 35(c) hearing, regarding counsel's strategy in not objecting to the domestic violence expert's testimony, this Court finds that the factual findings relied on by the trial court are presumed correct in this federal habeas proceeding and are supported by the state court record. Nov. 23, 2009 Postconviction Hr'g Tr.; Court File, Order Re: Crim. P. Rule 35(c) Motion, at 541-42.

Because Applicant does not point to any clear and convincing evidence to the contrary, the Court finds that he has not demonstrated a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland* at 694.

Even if trial counsel was ineffective in not objecting to the expert's testimony, Applicant's prejudice claims are conclusory and vague. Furthermore, in light of the overwhelming evidence presented in the state court proceedings that Applicant

committed the offense on August 27, 2002, Applicant was not prejudiced by the expert's testimony and the CCA's determination was reasonable.

Based on the above findings, the CCA decision, regarding Applicant's claim that trial counsel failed to challenge the domestic violence expert's testimony, did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Eleven(ii), therefore, lacks merit, and Applicant is not entitled to relief.

### iii. Failure to Recognize Nonwaivable Conflict of Interest

In this claim, Applicant asserts that trial counsel was representing a prosecution witness in a separate criminal case, but that counsel did not inform him of the representation until after Applicant's trial had started. ECF No. 1 at 30. Applicant asserts that even though counsel withdrew as the witness's counsel in the separate criminal case, the conflict of interest was not abated and the Sixth Amendment was violated. *Id.* at 31. Applicant contends that trial counsel still was in an untenable position of having to cross examine a former client without betraying any confidences and privileged information. *Id.* In particular, Applicant claims that trial counsel should have impeached this witness because the witness had been charged with fraud and theft, but was unable to do so because the information was confidential. *Id.* Applicant further contends that trial counsel's cross examination of this witness was less than rigorous and there was no finding made that any of the confidential information obtained from this witness, while trial counsel was representing her, would have been

65

admissible pursuant to CRD 608(b).  *Id.*  Applicant's trial and trial counsel's

examination, therefore, was impaired.  *Id.*

The CCA addresses this issue as follows.

### 4. Conflict of Interest

Defendant further contends the trial court failed to recognize a nonwaivable conflict.  In its order following the postconviction hearing, the court dismissed this claim as "spurious at best since [defendant's] trial counsel recognized that . . . her office could not represent the witness in a criminal matter and immediately withdrew and alternate defense counsel was appointed to represent the witness."

Trial counsel testified at the postconviction proceeding:

Q:  Did your office at some point represent Ms. Taken Alive [one of the prosecution's witnesses] in a felony case here in Colorado Springs?

A:  Apparently.

But once that attorney realized she was a witness in [defendant's] case, our office moved to withdraw and A.D.C. was appointed.  I think it was the same day.

Q:  Did you follow the policy of the Public Defender's office once you found out about the conflict?

A:  Yes.

Q:  Do you ever remember notifying [defendant] of this potential conflict?

A:  I think so.

The record supports the postconviction court's finding that this claim was "spurious at best."  This conduct does not support a claim of ineffectiveness.  *See Strickland*, 466 U.S. at 690-91; *Villarreal*, 231 P.3d at 36.

*Smith*, No. 10CA0098 at 21-24.

Counsel testified that the public defender's office did represent a witness in Applicant's case, but she stated that "once that attorney realized she was a witness in Mr. Smith's case, our office moved to withdraw and A.D.C. was appointed. I think it was the same day." Nov. 23, 2009 Postconviction Hr'g at 123. Counsel further testified that at the time Applicant was charged with the murder of the victim she did not believe she represented in a separate criminal case an individual who was a witness in Applicant's case. *Id.* at 155. Counsel stated that "I think [the witness] was on a deferred sentence, and there was a motion to revoke her deferred sentence at a later point in time where our office was appointed, and then we moved to withdraw and had A.D.C. appointed. *Id.* Counsel further confirmed that she did not represent the witness at the time she was appointed to represent Applicant. *Id.* at 156.

Based on the testimony and evidence before the state trial court at the Rule 35(c) hearing, regarding counsel's failure to address any conflict of interest, this Court finds that the factual findings relied on by the trial court are presumed correct in this federal habeas proceeding and are supported by the state court record. Nov. 23, 2009 Postconviction Hr'g Tr.; Court File, Order Re: Crim. P. Rule 35(c) Motion, at 542.

Because Applicant's claims are conclusory and vague and he does not point to any clear and convincing evidence to the contrary, the Court finds that Applicant has not demonstrated a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland* at 694.

Even if trial counsel was ineffective in not addressing any conflict of interest, Applicant fails to assert how he was prejudiced by trial counsel's conduct. His claims are highly speculative that counsel's actions prejudiced him. He does not assert how

he was prejudiced by counsel not (1) vigorously cross examining the witness; (2) notifying him of the witness representation until after his trial commenced; and (3) impeaching the witness by introducing as evidence that the witness had fraud and theft charges against her. Furthermore, in light of the overwhelming testimony of six eyewitnesses that Applicant committed the offense on August 27, 2002, he is not prejudiced by the testimony of one witness who may or may not have been represented by trial counsel of the public defender's office for a very short period of time after trial counsel was appointed to represent Applicant. The CCA's determination, therefore, was reasonable.

Based on the above findings, the CCA decision regarding Applicant's conflict of interest claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Eleven(iii), therefore, lacks merit and will be dismissed.

## V. CONCLUSION

Finding all claims either barred from federal habeas review or lacking in merit, and Applicant having voluntarily dismissed Claim Eight as moot and Claim Nine as inapplicable it is

ORDERED that Applicant Marlon L. Smith's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Application") (ECF No. 1) is DENIED and the civil action is dismissed WITH PREJUDICE. It is

FURTHER ORDERED that each party shall bear his own costs and attorney's fees.  It is

FURTHER ORDERED that no certificate of appealability will issue because Applicant has not made a substantial showing of the denial of a constitutional right, pursuant to 28 U.S.C. § 2253(c).  It is

FURTHER ORDERED that the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he also must pay the full $505 appellate filing fee or file a motion to proceed in forma pauperis in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

Dated this 1st day of December, 2015.

BY THE COURT:

_____
William J. Martínez
United States District Judge

69